UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EMILY DAVIS,                                   )
                                               )
        Plaintiff,                             )
                                               )          No. 4:18-CV-1574 HEA
v.                                             )
                                               )
CITY OF ST. LOUIS, etc., et al.,               )
                                               )
Defendants.                                    )

## DEFENDANT CITY'S ANSWER AND
## AFFIRMATIVE DEFENSES THIRD AMENDED COMPLAINT

Defendant City of St. Louis files this answer and affirmative defenses to Plaintiff's Third Amended Complaint [ECF 101]. Any averment of fact that is not expressly admitted herein is denied.

## JURISDICTION AND VENUE

1.     This claim is brought pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

**ANSWER:**   Paragraph 1 states no allegations of fact requiring no response. To the extent a response is required, Defendant admits that Plaintiff brings this action under 42. U.S.C. § 1983, but denies the apparent allegation of a direct action under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

2.    The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiff' action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

**ANSWER:   Paragraph 2 states no allegations of fact, requiring no response. To the extent a response is required, Defendant admits that this Court has jurisdiction.**

3.    Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

**ANSWER:   Paragraph 3 states no allegations of fact, requiring no response. To the extent a response is required, Defendant admits that venue is proper.**

4.    Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

**ANSWER:   Paragraph 4 states no allegations of fact, requiring no response. To the extent a response is required, Defendant admits that venue is proper.**

5.    This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

**ANSWER:   Paragraph 5 states no allegations of fact, requiring no response. To the extent a response is required, Defendant denies paragraph 5's allegations.**

6.    Plaintiff demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

ANSWER:   Defendant admits that Plaintiff have requested a jury trial.

PARTIES

7.         Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first- class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

**ANSWER:   Defendant admits that the City of St. Louis is a constitutional charter City organized and existing under the laws of the State of Missouri, but denies all other allegations of paragraph 7.**

8.         The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

**ANSWER:   Defendant admits that the division of police is a division or agency of the City of St. Louis and is commonly known as the St. Louis Metropolitan Police Department, and that the Division of Police operates in accordance with law as a division within City government, but denies all other allegations of paragraph 8.**

9.         The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

**ANSWER:   Defendant denies the allegations of paragraph 9.**

10.    Lawrence O'Toole was employed as a Lt. Colonel with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. On that date, he was the acting Chief  of Police and, along with Defendant Charlene Deeken, was

3

responsible for all management and  direction of the SLMPD. Defendant O'Toole knew or should have known that there was no  probable cause for the arrests of Plaintiff and that there was no legal justification to use force  against Plaintiff. Defendant O'Toole is a department head and is covered by Article VIII, Section  5 of the Charter of the City of St. Louis. Defendant O'Toole is sued in his individual capacity.

**ANSWER:  Defendant admits Lawrence O'Toole is employed as a police officer with the division of police. Defendant admits he was the Acting Commissioner of Police on September 17, 2017. Defendant denies all remaining allegations of paragraph 10.**

11.     Charlene Deeken was employed as the Director of Public Safety for the City of St.  Louis during the events of September 17, 2017. SLMPD is a subdivision of the St. Louis  Department of Public Safety. As such, she was the direct supervisor of Defendant O'Toole. On  September 17, 2017, Defendant Deeken and Defendant O'Toole were responsible for all  management and direction of the SLMPD. Defendant Deeken is a department head and is covered  by Article VIII, Section 5 of the Charter of the City of St. Louis. Defendant Deeken is sued in her  individual capacity.

**ANSWER:  Defendant admits Charlene Deeken was employed as the director of Public Safety on September 17, 2017. Defendant denies all remaining allegations of paragraph 11.**

12.      Gerald Leyshock is employed as a police officer with the SLMPD.

Mr. Leyshock has the rank of lieutenant colonel. Mr. Leyshock was the incident commander during the events of September 17, 2017. Lieutenant Colonel Leyshock knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:  Defendant admits Gerald Leyshock was employed as a police officer with the division of police and had the rank of lieutenant colonel. Defendant admits Gerald Leyshock was the incident commander during the events of September 17, 2017. Defendant denies all remaining allegations of paragraph 12.**

13.     Timothy Sachs is employed as a police officer with the SLMPD. Mr. Sachs has the rank of lieutenant. Mr. Sachs was on the ground supervising SLMPD officers during the events of September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil Disobedience Team to the scene of the mass arrest. Lieutenant Sachs knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:  Defendant admits Timothy Sachs was employed with the division of police and had the rank of lieutenant. Defendant admits Timothy Sachs was present for protest activities and police response on September 17, 2017. Defendant denies all remaining allegations in paragraph 13.**

14. Daniel Howard is employed as a police officer with the SLMPD. Defendant Howard has the rank of major. On the night of the incident, he was commander of the South Patrol.  Howard was on the ground supervising SLMPD officers during

the events of September 17, 2017. Defendant Howard also assisted Leyshock with planning the kettling event. Defendant Howard knew or should have known that there was no probable cause for the arrests of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Howard is sued in his individual capacity.

**ANSWER:** **Defendant admits Daniel Howard was employed with the division of police and had the rank of lieutenant. Defendant admits Defendant Howard was present for protest activities and police response on September 17, 2017. Defendant denies all remaining allegations in paragraph 14.**

15.    Randy Jemerson is employed as a police officer with the SLMPD. Mr. Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Jemerson knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:** **Defendant admits Randy Jemerson is currently employed as a police officer with the division of police and has the rank of lieutenant.  Defendant admits that Randy Jemerson was a supervisor with the Civil Disobedience Team. Defendant denies all remaining allegations in paragraph 15.**

16.    Brian Rossomanno is employed as a police officer with the SLMPD. Mr. Rossomanno has the rank of sergeant. He is a supervisor with the SLMPD's

Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Rossomanno knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**<u>ANSWER:</u> Defendant admits Brian Rossomanno was employed with the division of police and had the rank of sergeant during the events of September 17, 2017. Defendant admits Brian Rossomanno was a supervisor of the Civil Disobedience Team. Defendant denies all remaining allegations in paragraph 16.**

17. Defendants Lieutenant Kimberly Allen, Lieutenant Scott Aubuchon, Lieutenant  Scott Boyher, Lieutenant Daniel Chitwood, Lieutenant James Joyner, Lieutenant Christi Marks,  Lieutenant Michael Mayo, Lieutenant Donnell Moore, Lieutenant Paul Piatchek, Sergeant Eric  Bartlett, Sergeant Ronald Bergmann, Sergeant Michael Binz, Sergeant James Buckeridge,  Sergeant Curtis Burgdorf, Sergeant Joe Carretero, Sergeant Anthony Caruso, Sergeant James  Clark, Sergeant Darnell Dandridge, Sergeant Adam Duke, Sergeant Kelly Fisher, Sergeant Brandt Flowers, Sergeant Samuel Gilman, Sergeant Patrick Haug, Sergeant John Jones, Sergeant Matthew Karnowski, Sergeant Robert Lammert, Sergeant Joe Lankford, Sergeant Robert Laschober,  Sergeant Tom Long, Sergeant Kyle Mack, Sergeant Mike Mandle, Sergeant Michael Marks,  Sergeant Mark McMurry, Sergeant James Murphy, Sergeant Dennis Neal, Sergeant Patricia  Nijkamp, Sergeant Kenneth Nizick, Sergeant Donald Re, Sergeant  Bradley Roy, Sergeant Daniel   Schulte,

Sergeant Michael Scego, Sergeant Timothy Schumann Sergeant Brian Seppi, Sergeant  Stephen Slama, Sergeant Cliff Sommer, Sergeant Timothy Turner, Sergeant Scott Valentine,   Sergeant Charles Wall, Sergeant Donnell Walters, Sergeant Scott Weidler, Sergeant Carolyn  Wiener, and Sergeant Anthony Wozniak ("Supervisor Officers") were employed as senior officers  with the SLMPD during the events of September 17, 2017, as detailed in this Complaint.  According to the City's own documents, Supervisor Officers supervised SLMPD Officers during  the events in question, directed the police officers in their command to arrest the persons at the intersection of Washington and Tucker, and knew or should have known that there was no probable  cause for the arrests of Plaintiff and that there was no legal justification to use force against   Plaintiff. These Defendant is sued in their individual capacities.

**ANSWER:   Defendant admits that each officer listed in paragraph 17 was employed with the division of police on September 17, 2017. Defendant denies paragraph 17's remaining allegations.**

18.     There are other, unidentified SLMPD officers who have not been named as defendants in this litigation who contributed to, and/or participated in, the conduct described herein. These unnamed officers assaulted Plaintiff, prevented Plaintiff from leaving the area, and unlawfully arrested Plaintiff. Plaintiff has been unable to identify these officers because some of the officers removed their name tags from their uniforms in violation of guidance promulgated by the U.S. Department of Justice and standard law enforcement practices. Further, the officers wore masks

concealing their faces. In violation of its policies, the City of St. Louis and SLMPD failed to properly document the arrests and the various use of force against Plaintiff and other persons arrested that evening. The City of St. Louis and SLMPD also failed to conduct an adequate investigation into the identity of the officers who were involved in the kettling incident. To this day, the City cannot identify every officer involved in the incident. But for the actions of the individual officers, the SLMPD, and the City of St. Louis, these officers could have been identified. Additionally, unidentified officers described below knew or should have known that there was no probable cause for the arrests of Plaintiff and that there was no legal justification to use force against Plaintiff.

> **ANSWER:**   Defendant denies paragraph 18's allegations.

19. Plaintiff is a resident of St. Louis County who was in St. Louis to attend demonstrations protesting Officer Jason Stockley's acquittal of the first-degree murder of Anthony Lamar Smith.

> **ANSWER:**   **Defendant admits that plaintiff was an active participant in protests and disorder in St. Louis during the relevant time period but is otherwise without sufficient information to form a belief as to the truth of paragraph 19's allegations, and therefore denies the same.**

## FACTS

21. On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith.

**ANSWER:**   Defendant admits the allegations of paragraph 21.

22.   Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

**ANSWER:**   Defendant admits paragraph 22's allegations

23.  In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

**ANSWER:**   **Defendant admits that, in response to threats of civil disorder, police officers were deployed at various locations, but Defendant denies that all such officers were fully equipped with riot gear or chemical agents; Defendant denies all other allegations of paragraph 23.**

24.   This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

**ANSWER:**   **Defendant denies paragraph 24's allegations.**

25. The vast majority of protestors and protestor activity were non-violent and confined to peaceful marching and chanting.

**ANSWER:**   **Defendant denies paragraph 25's allegations.**

10

26.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

a.      The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

b.      The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.      The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.      The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.      The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.      The evening of Friday, September 15, 2017, on Hortense Place.

i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.      The evening of September 29, 2017 outside of Busch Stadium.

**ANSWER:   Defendant admits that in responding to illegal conduct by**

11

persons engaged in disorderly protest and other group actions in September 2017 in the City of St. Louis, some police officers utilized chemical agents in a reasonable and lawful manner; Defendants otherwise denies each and every allegation of paragraph 26 and each subparagraph thereof.

27. These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

**ANSWER:**   Defendant denies paragraph 27's allegations.

28.      In October 2014, SLMPD fired chemical agents at protestors on South Grand.

**ANSWER:**   Defendant denies paragraph 28's allegations.

29.        In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

**ANSWER:**   Defendant denies paragraph 29's allegations.

30.        On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)      utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

(a)       without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
(b)       without providing the individuals sufficient opportunity to heed the warnings and exit the area;
(c)       without minimizing the impact of such chemical

agents on individuals who are complying with lawful law enforcement commands; and

(d)         without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)         utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Temporary Restraining Order in *Templeton v. Dotson*, 2016 WL

13650910, No. 4:14-cv-02019 at *3 (E.D. Mo. Dec. 11, 2014).

**ANSWER:** **Defendant admits that an order was entered as alleged and that a portion of that order is quoted in paragraph 30; Defendant denies all other allegations of paragraph 33.**

31.     This suit was in response to SLMPD firing chemical agents into a business where peaceful protestors had congregated without allowing the protestors to leave.

**ANSWER:** **Defendant denies paragraph 31's allegations.**

32.     The City entered into a settlement agreement on March 25, 2015, where it agreed as follows:

A.             Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)         utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:

(a)         without first issuing clear and unambiguous warnings that such chemical agents will be utilized;

13

(b)          without providing the individuals sufficient opportunity to heed the warnings and exit the area;

(c)          without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and

(d)          without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.

(2)          utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.

B.          Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat.

*See* Settlement Agreement, *Templeton v. Dotson*, 2015 WL 13650910, No. 4:14-cv-02019 at *1- 2 (E.D. Mo. Mar. 25, 2015).

**ANSWER:**   Defendant admits that the City of St. Louis as well as other defendants (St. Louis County and the State of Missouri) entered into a consent decree in settlement of claims in the case styled *Templeton v. Dotson, et al.*, that a portion of the consent decree is quoted in paragraph 32; Defendant objects to allegations pertaining to a settlement agreement as a basis for a complaint and Defendant denies all other allegations of paragraph 32.

33. Less than two months after entering into this Consent Decree, SLMPD began to  violate the Decree.

**ANSWER:**   Defendant denies paragraph 33's allegations.

37. On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another

14

African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning.

**ANSWER:**   Defendant denies paragraph 34's allegations.

35. On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. Sarah Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns.

**ANSWER:**   Defendant denies paragraph 35's allegations.

36. On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. Although a few people did engage in  unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of  whom were involved in criminal activity or were even at the same location as the criminal activity.  These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents.

**ANSWER:   Defendant admits that a group of violent persons attempted to**

invade the premises of a correctional facility known as the Medium Security Institution of the City of St. Louis in July 2017, and that reasonable and lawful measures were taken by police officers to protect themselves and the facility; Defendants otherwise denies the allegations of paragraph 36.

37. Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendants' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton.*

**ANSWER:   Defendant denies paragraph 37's allegations.**

38. This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 17, 2017.

**ANSWER:   Defendant denies paragraph 38's allegations.**

39. According to testimony Defendant Rossomanno gave in federal court, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and  destroyed flowerpots on the 900, 1000, and 1100 blocks of Olive Street in downtown St. Louis.

**ANSWER:   Defendant admits at various points on September 17, 2017 individuals engaged in various forms of property damage. Defendant denies the remaining allegations in paragraph 39.**

40. At the time of this incident, the SLMPD arrested numerous individuals for this vandalism.

**ANSWER:**    Defendant denies paragraph 40's allegations.

41. There is no evidence nor allegations that Plaintiff was in any way involved in this destruction of property.

**ANSWER:**    Defendant denies paragraph 41's allegations.

42. Plaintiff are not aware of any evidence that any person arrested during the kettle was in any way involved in the destruction of property.

**ANSWER:**    Defendant is without sufficient information to form a belief as to what the Plaintiff are aware of, and therefore denies the same.

43. Defendant Leyshock was the incident commander directing all of the supervisors including the other named Defendants.

**ANSWER:**    Defendant admits that Defendant Leyshock was the incident commander on September 17, 2017. Defendant denies paragraph 43's allegations.

44. Defendant Sachs was in direct command of the officers in tactical gear.

**ANSWER:**    Defendant denies paragraph 44's allegations.

45. At approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions."

**ANSWER:**    Defendant admits protestors were given repeated dispersal orders and warned of the possibility of arrests and chemical munitions. Defendant otherwise denies paragraph 45's allegations.

46. A second dispersal order was given at 8:51 PM.

**ANSWER:**    Defendant admits protestors were given repeated dispersal

**orders and warned of the possibility of arrests and chemical munitions. Defendants**

**otherwise denies paragraph 46's allegations.**

47. Defendants Rossomanno and Jemerson directed people to the intersection of Washington and Tucker, where the Defendants had already decided that they would kettle, pepper spray, beat, and illegally arrest Plaintiff.

<u>ANSWER</u>:   Defendant denies paragraph 47's allegations.

48. These dispersal orders could not be heard or understood by other police officers, let alone civilians in the area. In testimony given later in federal court, Defendant Sachs testified that he heard some sort of order being given, but that he could not make out "exactly what was being said."

<u>ANSWER</u>:   Defendant denies paragraph 48's allegations.

49.          Over the next two plus hours, SLMPD officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

**<u>ANSWER</u>:   Defendant admits that on September 17, 2017 officers blocked certain roads downtown. Defendants otherwise denies the allegations of paragraph 49.**

50. Defendant Karnowski and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard. He also testified that he determined that the protest that evening was an "unlawful assembly."

**<u>ANSWER</u>: Defendant admits that on the evening of September 17, 2017 an**

unlawful assembly was occurring in the vicinity of Washington and Tucker. **Defendants otherwise denies paragraph 50's allegations.**

51. This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

**ANSWER: Defendant admits paragraph 51's allegations.**

52. Defendant Sachs came up with the plan to arrest everyone present. He presented his plan to Defendant Leyshock, who approved the plan. The plan was to not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard.

**ANSWER:   Defendant admits that probable cause existed to arrest persons at Tucker and Washington and that defendants Leyshock and Sachs took measures to prepare to arrest persons who did not disperse in accordance with repeated orders; otherwise denied.**

53. Defendants Leyshock, Sachs, Rossomanno, and Jemerson knew or should have  known that their plan to kettle the people that SLMPD directed to the intersection of Washington  and Tucker and arrest them, merely for being present, would result in arrests without probable  cause and the unjustified use of force to effectuate said arrests.

**ANSWER:   Defendant denies paragraph 53's allegations.**

54.      At approximately 11:15 PM or 11:20 PM, SLMPD officers began forming into lines.

**ANSWER:   Defendant admits police officers formed lines in the vicinity of**

Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 54's allegations.

55.    This was nearly three hours after the windows and flower pots were broken and many blocks away from the damaged businesses.

**ANSWER:   Defendant denies paragraph 55's allegations.**

56.    SLMPD's Civil Disobedience Team appeared at the scene.

**ANSWER:   Defendant admits paragraph 56's allegations.**

57. According to the Civil Disobedience Response Operations Plan created by the  SLMPD, the Civil Disobedience Team was broken down into South, Central and North Patrols,  each further broken down into Alpha, Bravo, Charlie, Delta squads and arrest teams ("CDT  Squads").

**ANSWER:   Defendant admits that is the general organization of the CDT teams.**

58. In addition to the CDT Squads, officers from the Bicycle Response Team, Mobile Reserve - SWAT and Special Operations Unit actively participated in the kettling, arrests, and uses of force on Plaintiff and other citizens at the corner of Tucker and Washington.

**ANSWER:   Defendant denies paragraph 58's allegations.**

59. As identified in the Civil Disobedience Response Operations Plan, the police report of the incident, and the videos taken by the City, each Supervisor Officer is a supervisor of one of the participating CDT Squads, Bicycle Response Team, Special Operations team or Mobile Reserve – SWAT team.

**ANSWER:**   Defendant denies paragraph 59's allegations.

60. The Supervisor Officers were an integral part of the kettling and subsequent use of excessive force because they directed their subordinates to participate in the kettle and unlawfully seize Plaintiff and the other citizens arrested that night.

**ANSWER:**   **Paragraph 60 contains argumentative statements and legal conclusions rather than allegations of fact. To the extent a response is required, denied.**

61. A line of officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

**ANSWER:**   **Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise denies paragraph 61's allegations.**

62. A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

**ANSWER**:   **Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise denies paragraph 62's allegations.**

63. A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

**ANSWER**:   **Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17,**

2017. Defendants otherwise denies paragraph 63's allegations.

64. All three of these lines were comprised of officers all wearing military-like tactical dress, including helmets. These officers were carrying long wooden batons and full-body riot shields.

**ANSWER**:   Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise denies paragraph 64's allegations.

65. A fourth line of extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

**ANSWER**:   Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise denies paragraph 65's allegations.

66. Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER**:   Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendants otherwise denies paragraph 66's allegations.

67. Without further instruction or warning, SLMPD officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people trapped inside from leaving.

**ANSWER**:   Defendant admits police officers formed lines in the vicinity of

Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admits that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendant otherwise denies paragraph 67's allegations.

68. As they approached, the SLMPD police officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

<u>ANSWER:</u>   Defendant admits that officers used batons to beat a cadence to assist in keeping formation and otherwise denies paragraph 68's allegations.

69. As the SLMPD police officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker Boulevard, the officers blocked anyone from leaving the area.

<u>ANSWER:</u>   Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admits that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise denies paragraph 69's allegations.

70. Multiple citizens approached officers and requesting to be let past. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!"

<u>ANSWER:</u>   Defendant denies paragraph 70's allegations.

71. In addition, the closing phalanxes of officers cut off access to all alleys

and other means of egress.

**ANSWER:** Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admits that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise denies paragraph 71's allegations.

72. As the four lines closed, they trapped everyone who was within a one-block radius of the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER:** Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admits that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendants otherwise denies paragraph 72's allegations.

73. This is a law enforcement tactic known as "kettling."

**ANSWER:**   Defendant denies paragraph 73's allegations.

74. The SLMPD police officers kettled a wide variety of innocent citizens, including  self-admitted protestors, residents who merely lived in the area, people visiting businesses in the  area, reporters, documentarians, and homeless persons.

**ANSWER:**   Defendant denies paragraph 74.

75. The officers even grabbed an African-American male who was outside of the kettle and threw him into the kettle.

**ANSWER:**   Defendant denies paragraph 75.

24

76. As the kettle closed, many individuals approached the officers and begged to pass.

ANSWER:   Defendant denies paragraph 76.

77. Not surprisingly, the individuals in the kettle gravitated toward the line of bicycle officers rather than three lines of police in military gear, who were banging wooden batons against their riot shields.

ANSWER:   Defendant is without sufficient knowledge to form a belief as to the truth of paragraph 77's allegations, and therefore denies the same.

78. Individuals peacefully approached the bicycle officers with their hands up.

ANSWER:   Defendant denies paragraph 78.

79. In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

ANSWER:   Defendant denies paragraph 79.

80. The Supervisor Officers were directing these officers.

ANSWER:   Defendant denies paragraph 80.

81. Rather than defuse the situation, many of the Supervisor Officers directed the officers under their command to use force against the peacefully assembled people and supervised the unlawful arrests. The other Supervisor Officers made no attempt to stop the illegal use of force and the unlawful arrests.

ANSWER:   Defendant denies paragraph 81.

82. Some Supervisor Officers, including Defendants Karnowski, Aubuchon,

Kiphart,  Long, actively engaged in the use of excessive force by arbitrarily and unconstitutionally  pepper spraying peaceful citizens who were in compliance with police orders, to the extent they  were even given. Their actions caused Plaintiff to experience chaos, fear and terror.

> **ANSWER:**   Defendant denies paragraph 82.

83. Those other Supervisor Officers that did not actually deploy pepper spray or put their hands on citizens still stood and watched as others did use excessive force and failed to intervene despite having the authority and opportunity to do so.

> **ANSWER:**   Defendant denies paragraph 83.

84. Some of the Supervisor Officers, including Defendants Karnowski, Aubuchon, Kiphart, Long, and Coats actively engaged in the unconstitutional use of pepper spray on innocent civilians. The others stood by and watched as civilians, including Plaintiff, were unconstitutionally arrested, beaten, pepper-sprayed, and failed to intervene in the violation of Plaintiff's civil rights.

> **ANSWER:**   Defendant denies paragraph 84.

85. At the very beginning of the kettle, a few people caught in the crowd peacefully stood with their hands up in front of the line of officers, trying to understand what was happening.  Defendant Karnowski instigated the violent attacks against the innocent citizens when he unleashed pepper spray against several citizens who were peacefully standing still with their hands up. At no time was Defendant Karnowski in any danger as he was safely standing with a line of bicycle officers between him and the citizens. All of his illegal actions were

documented on a video camera strapped to his helmet.

**ANSWER:**   Defendant denies paragraph 85.

86. Almost immediately after, Defendant Aubuchon followed suit and indiscriminately sprayed numerous innocent civilians.

**ANSWER:**   Defendant denies paragraph 86.

87. The use of excessive force at the outset of the arrest by a lieutenant and sergeant was tacit approval to the other officers to engage in the same unconstitutional behavior. Their behavior resulted in a domino effect of excessive force and unconstitutional behavior on Plaintiff and the others arrested that evening.

**ANSWER:**   Defendant denies paragraph 87.

88. Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

**ANSWER:**   Defendant denies paragraph 88.

89. Many laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

**ANSWER:**   Defendant denies paragraph 89.

90. Even though video evidence shows that none of the individuals inside the kettle were acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning.

**ANSWER:**   Defendant denies paragraph 90.

91. One of the Supervisor Officers, Defendant Kiphart, viciously attacked a journalist with a camera with pepper spray from a "fogger" which also sprayed indiscriminately into the crowd. Moments later, Detective Matthew Burle deployed another fogger blast towards the same journalist and those sitting near him with more pepper spray in the face, yet another concrete example of a subordinate officer taking a cue from a Supervisor Officer to engage in unconstitutional excessive force.

**ANSWER:**   Defendant denies paragraph 91.

92. Many of the persons arrested were kicked, beaten, and dragged.

**ANSWER:**   Defendant denies paragraph 92.

93. Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known pattern and practice of using chemical agents against peaceful protestors.

**ANSWER:   Defendant admits individuals wore masks and goggles concealing their identities. Defendants otherwise denies paragraph 93's allegations.**

94. Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

**ANSWER:   Defendant admits individuals were wore masks and goggles concealing their identities. Defendants otherwise denies paragraph 94's allegations.**

95. In response, SLMPD officers roughly removed the goggles of some individuals and then sprayed them directly in the face.

**ANSWER:**   Defendant denies paragraph 95's allegations.

28

96. At the same time, SLMPD officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

**ANSWER:   Defendant denies paragraph 96's allegations.**

97. These punitive measures were delivered without regard to the fact that the individuals were peaceful and compliant.

**ANSWER:   Defendant denies paragraph 97's allegations.**

98. Defendants Jemerson, Rossomanno, and the Supervisor Officers were within arms-length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens.  Rather than instructing these officers to cease violating the civil right of the citizens, these Defendants took control of the situation and directed the officers' unlawful actions.

**ANSWER:   Defendant denies paragraph 98's allegations.**

99. SLMPD officers used hard plastic zip ties to arrest all of the individuals. Over two months later, several continue to suffer from pain and numbness in their hands due to the tightness of the zip ties.

**ANSWER: Defendant admits some plastic zip tie handcuffs were used in an appropriate manner. Defendants otherwise denies paragraph 99's allegations.**

100. Over 100 people were arrested that night.

**ANSWER:   Defendant admits paragraph 100's allegations.**

101. During and after the arrests, SLMPD officers were observed high fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees will, and chanting "Whose Streets? Our Streets!"

<u>**ANSWER:**</u> **Defendant admits some chanting occurred for which officers were later reprimanded. Defendant otherwise denies the allegations of paragraph 101.**

102. That evening, the following celebratory picture was posted on Twitter by an anonymous person:



<u>**ANSWER:**</u>  **Defendant admits the photo was posted by an anonymous person. Defendants otherwise denies the allegations of paragraph 102.**

103. By the coordinated actions of the officers in circling the assembly into the kettle  and the systematic disbursement of the chemical agents, it is clear that these tactics were planned  and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct  of Defendants.

<u>**ANSWER:**</u>   **Defendant denies paragraph 103's allegations.**

104. Defendants' actions did not occur randomly. Rather, Defendants decided beforehand that they would make an example of the arrestees in an attempt to scare

other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

**ANSWER:**  Defendant denies paragraph 104's allegations

105. SLMPD officers specifically hid their identity from observers and citizen arrestees including Plaintiff by obscuring their identities the night of the incident, and by intentionally failing to record which officers seized or interacted with which arrestee. The officers hid their identity in order to scare and intimidate observers, terrorize the citizen arrestees, avoid any department accountability, avoid any civil or criminal legal responsibility, and to help fellow officers avoid identifying wrongdoers following the incidents.

**ANSWER:**        Defendant denies paragraph 105's allegations.

106. The next day, the SLMPD Acting Chief reinforced the City's ratification of the  Defendants' actions when he said, "I'm proud to say the city of St. Louis and the police owned the  night," while standing next to Saint Louis Mayor Lyda Krewson.

**ANSWER:**        Defendant denies paragraph 106's allegations.

107. The day after the arrests, Mayor Krewson further validated the illegal actions of Defendants when she thanked the officers "for the outstanding job they have been doing over the last three days." She added that she fully supported the actions of the officers.

**ANSWER:**        Defendant admits that St. Louis police properly enforced the law during the period in question. Defendant otherwise denies the allegations

in paragraph 107.

108. Since then, the U.S. Attorney's Office brought indictments in federal court against 5 SLMPD Officers on the Civil Disobedience Team for the beating of an undercover police officer on September 17, 2017. Emails quoted in the indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their identities in order to beat protestors. This is exactly what occurred to Plaintiff, under the direct supervision and control of Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno.

**ANSWER: Defendant admits certain officers have been indicted for unauthorized illegal activity. These officers are in the process of being disciplined. Defendants otherwise denies the allegations in paragraph 108.**

109. The indictment quoted text messages sent to and from the defendant officers regarding the mass arrest on September 17, 2017,that prove the vicious and unlawful intent of the officers and belie any post hoc justification for the kettling, use of chemical agents, excessive force, and arrests:

a. "The more the merrier!!! It's gonna get IGNORANT tonight!! But it's gonna be a  of lot of fun beating the hell out of these shitheads once the sun goes down and  nobody can tell us apart!!!!"

b. "R u guys in [South Patrol Division] prepping anything for the war tonight?" c. "We reloading these fools up on prisoner busses. As they got on we all said in unison 'OUR STREETS' haha."

d. "Yeah. A lot of cops gettin hurt, but it's still a blast beating people that deserve it.  And I'm not one of the people hurt, so I'm still enjoying each night."

e. "The problem is when they start acting like fools, we start beating the shit out of  everyone on the street after we give two warnings."

f. "I'm on (Sgt **'s) arrest team! Me and a BIG OL black dude r the guys that are hands on! No stick or shield… just (expletive) people up when they don't act right! …"

**ANSWER:**   Defendant admits certain officers have been indicted for unauthorized illegal activity. These officers are in the process of being disciplined. Defendants otherwise denies the allegations in paragraph 109.

110. When detaining individuals in custody who require medical care, the City of St.  Louis and its SLMPD has established the following policy:

PRISONERS REQUIRING MEDICAL ATTENTION (72.6.1)

1. A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2. Should a prisoner require emergency medical attention, whether the

injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to respond to the holdover for medical evaluation and if necessary conveyance to the hospital. EMS will determine the destination hospital. An I/LEADS report will be prepared documenting all treatment received by the prisoner. If immediate first aid is administered by a Department employee or the paramedics, the injury and treatment will be noted in the Prisoner's Log Book by the booking clerk.

3. Should a prisoner require non-emergency medical attention, the on-duty nurse at the City Justice Center will be contacted for guidance.

4. The confidential relationship of doctor and patient extends to prisoner patients and their physician.

5. In the event a prisoner is injured while in custody or shortly before being taken into custody, the Watch Commander will arrange to have photographs taken of any and all visible injuries. The photographs will be treated as physical evidence. If practical, the photos should be taken both prior to the application of bandages, etc., and after the injury has received appropriate medical attention

PRISONER HEALTH SCREENING (72.6.3)

The following prisoner medical "receiving screening" information will be obtained and recorded on the Field Booking Form when prisoners are booked and verified

upon their transfer to another  facility or release:

     1. Current health and medical history of the prisoner; (72.6.3.a)

     2. Medication taken by the prisoner; (72.6.3.b)

     3. Known medication/drug allergies;

     4. Behavior, including state of consciousness and mental status; and

     (72.6.3.c) 5. Body deformities, trauma markings, bruises, lesions, jaundice

     (a yellowness of the skin and whites of the eyes), and ease of movement

     (72.6.3.d)

NOTE: a copy of the Field Booking Form **must** be attached to the

computerized Arrest Register whenever a prisoner is transferred to the City Justice

Center.

     **ANSWER: Defendant admits paragraph 110's allegations.**

     111. On information and belief, the SLMPD and City of St. Louis Correctional

Staff failed and/or refused to follow this policy when they provided no medical care

to any of the people illegally pepper sprayed.

     **ANSWER:   Defendant denies paragraph 111's allegations.**

     112. Defendants' decision to ignore the policy constitutes a custom and

practice of failing and/or refusing to follow this policy designed to protect the safety

and wellbeing of injured  individuals in police custody, showing a deliberate

indifference by Defendants to the rights of  Plaintiff and other injured detainees.

     **ANSWER:   Defendant denies paragraph 112's allegations.**

     113. Despite this policy, at no time between their arrest and their release from

the St.  Louis City Justice Center did any police officer or other city official provide any arrestee with  medical care or give anything to them to wash the chemical agents out of their eyes, off their  bodies, or off their clothes.

> **ANSWER:**   Defendant denies paragraph 113's allegations.

114. Upon their release, all of the arrestees were given summonses showing that they had been charged with "failure to disperse." They were instructed to appear at St. Louis City Municipal Court on October 18, 2017.

> **ANSWER:**   **Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 114's allegations and therefore denies the same.**

115. They were charged as such even though SLMPD officers provided no means of  egress, denied repeated requests to be allowed to leave, and kettled the individuals.

> **ANSWER: Defendant denies paragraph 115's allegations.**

116. In at least one case, a person was thrown from outside of the kettle into the kettle by SLMPD and was subsequently arrested for failure to disperse.

> **ANSWER:**   Defendant denies paragraph 116's allegations.

117. The press release stated "[m]any of the demonstrators were peaceful, however after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob.  Multiple businesses also sustained property damage and one officer suffered a serious injury."

> **ANSWER:**   Defendant admits paragraph 117's allegations.

118. Egregiously and in an attempt to further punish its victims, SLMPD

publicly released the addresses of the arrestees.

> **ANSWER:**   Defendant denies paragraph 118's allegations.

119. The video evidence, as the federal court observed, "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area" – much less a mob. SLMPD also fails to mention that the "one officer who suffered a serious injury" was an undercover officer who was pepper sprayed and beaten by SLMPD.

> **ANSWER:**   Defendant denies paragraph 119's allegations.

120. SLMPD used its Twitter account to disseminate this false statement to its approximately 70,000 followers. SLMPD subsequently deleted the tweet.

> **ANSWER:**   Defendant denies paragraph 120's allegations.

121. During a preliminary injunction hearing, attorneys representing the City stated that it was the policy of the City of St. Louis that once property damage occurs, SLMPD is justified in declaring an unlawful assembly and then deploying chemical agents regardless of the proximity of the target individuals in time or space to the property damage and regardless of if the people were engaged in criminal activity. According to the City, officers are justified to use chemical agents or beat and arrest anybody merely for being close to the area, even hours after the criminal activity has occurred.

> **ANSWER:**   Defendant denies paragraph 121's allegations.

122. On October 13, 2017, the St. Louis City Counselor's office issued a letter stating "[a]s of today, the City Counselor is still reviewing the evidence against you

in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017. Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered. After a review of the matter  is completed, should a decision be made to file charges against you, you will be notified by mail  of that decision and advised when and where to appear to defend against those charges."

    <u>ANSWER:</u>   Defendant admits paragraph 122's allegations.

123. On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Doc. 58, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

    <u>ANSWER:</u>   Defendant admits that an order was entered by the Court in the case referenced above. Defendants otherwise denies paragraph 123's allegations.

124.  The  Court  found  that  "[p]rotest  activity  began  shortly  after  the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id.* at 2.

    <u>ANSWER:</u>   Defendant admits that paragraph 124 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 124.

125. The Court found that on September 17, 2017, there was some property

damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM". *Id.* at 9.

**ANSWER:   Defendant admits that paragraph 125 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 125.**

126. The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but that "this order did not specify how far protesters had to go to comply with the directive to leave the area." *Id.* at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id.* at 8-9.

**ANSWER:   Defendant admits that paragraph 126 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 126.**

127. The Court found that Defendant Sachs "testified that around 10:00 PM the decision was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

**ANSWER:   Defendant admits that paragraph 127 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 127.**

128. The last known dispersal order was given approximately 45 minutes

*before* the mass arrests began but approximately 45 *after* SLMPD made the decision to conduct a mass arrest.   This final dispersal order was once again given approximately two blocks south of the intersection of Washington and Tucker. The dispersal order[2] was "You are being ordered to disperse from the area of Locust and Tucker by walking north on Tucker or west on Locust." Rather than being a legitimate order, this was a trap. By complying with the order and moving north on Tucker as[2] these dispersal orders were premised on SLMPD's determination that there was an "unlawful assembly." The *Ahmad* court determined that the SLMPD made that determination in contravention of the language of the statute and that the statute was overly broad. *See* Doc. 58, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D.  Mo. Nov. 15, 2017). Directed by police, the citizens were forced to the intersection of Washington and Tucker, which SLMPD had already designated as the mass arrest location. Even though the citizens complied with the order, they were arrested for failure to comply.

    **ANSWER:** Defendant denies paragraph 128's allegations, including footnote.

    129. The Court found that at approximately 11:30 PM SLMPD began a mass arrest of  everyone in the vicinity even though video evidence presented to the Court "does not shows a large  crowd congregating in the streets" and "[n]o violent activity by protesters can be observed on the  video." *See* Doc. 58 at 10, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017). In fact, the "scene appears calm and most people appear relaxed." *Id.*

at 10-11. The only signs of disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the police. *Id.* at 10.

**ANSWER:**   Defendant admits that paragraph 129 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 129.

130. The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12.

**ANSWER:**   Defendant is without sufficient knowledge and information to admit the allegations of the paragraph.

131. The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

**ANSWER:**   Defendant admits that paragraph 131 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 131.

132. In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at

this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id.* at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

<u>ANSWER:</u>   **Defendant admits that paragraph 132 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 132.**

133. The Court made the following findings:

a. Plaintiff are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of Plaintiff. *Id.* at 35-36.

b. Plaintiff have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of Plaintiff' First and Fourth Amendment rights. *Id.* at 36.

c. Plaintiff' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to officers or property in this mixed commercial and residential area**. *Id.* at 37. (Emphasis added).

d. Plaintiff have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of

42

committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id.* at 37-38. Plaintiff have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of Plaintiff' constitutional rights. *Id.*

 e.  Similarly, Plaintiff have presented sufficient evidence demonstrating that   they are likely to prevail on their claim that defendant's custom or policy is to permit  officers to issue vague dispersal orders to protesters exercising their first amendment rights  in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest,  in violation of Plaintiff' First and Fourth Amendment rights. *Id.* at 39.

 f. Plaintiff presented sufficient, credible evidence for purposes of awarding  preliminary injunctive relief that defendant has a custom or policy, in the absence of  exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity  critical of police which are either too remote in time and/or too vaguely worded to provide  citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not  repeated with sufficient frequency and/or by a sufficient number of

officers to provide   citizens with sufficient notice and a reasonable opportunity to comply, contradictory and   inconsistent, not uniformly enforced, and retaliatory. *Id.* at 40.

g. Plaintiff have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights,  in violation of the First, Fourth, and Fourteenth Amendments. *Id.* at 41.

h. Plaintiff have presented sufficient, credible testimony and video evidence  from numerous witnesses that they were maced without warning in the absence of exigent  circumstances while they were not engaging in violent activity and either were not in   defiance of police commands (because none were given) or were complying with those  commands. *Id.* at 42.

i. The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id.* at 43-44.

j. Plaintiff evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, Plaintiff have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id.* at 44.

k. Plaintiff have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id.* at 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008)(internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id.* at 44-45.

**ANSWER:** Defendant admits that paragraph 133 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 133 and each of its subparts.

134. Upon information and belief, senior officials of the SLMPD, including Defendants Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from  engaging in such conduct and by not disciplining them when they did engage in such actions and  conduct.

**ANSWER:**   Defendant denies the allegations and conclusions of paragraph 134.

135. At no point since the mass arrest in September 2017 has SLMPD Internal Affairs Division done an internal investigation of any kind into the numerous citizen complaints filed following the kettling.

**ANSWER:**   Defendant denies the allegations and conclusions of paragraph 135.

136. On September 15, 2017, at around 8:30 PM, Ms. Davis went to the Central West End neighborhood of St. Louis to join a clergy-led gathering.

**ANSWER:**   Defendant is without sufficient information to admit or deny paragraph 136.

137. Ms. Davis and her friend parked on Lindell Boulevard and then rode bicycles to the site of the gathering on Euclid Avenue.

**ANSWER:**       Defendant is without sufficient information to admit or deny paragraph 137.

138.  Ms. Davis took a photograph of people sitting in the street and posted it to Facebook at 8:34 PM. Ms. Davis observed several groups begin to

march north on Euclid near Maryland Avenue. Ms. Davis was unsure which direction the majority of protesters were headed, so she and her friend rode their bicycles west on Waterman Boulevard across Kingshighway to try to see where protesters were gathered.

**ANSWER:**     **Defendant is without sufficient information to admit or deny paragraph 138.**

139. As Ms. Davis and her friend approached Lake, Ms. Davis moved to meet the several dozen people gathered north of Waterman. Ms. Davis and her friend approached the intersection of Waterman and Washington and saw a line of police officers walked into the intersection. Ms. Davis observed Defendant Rossomanno shouting at the protesters to leave.

**ANSWER:**    **Defendant denies the allegations and conclusions of paragraph 139.**

140. Ms. Davis and others turned to leave and then noticed a police officer yank a bicycle out from under the man riding the bicycle which resulted in the man being knocked off the bicycle with the bicycle falling on top of him. Ms. Davis observed that the man who was knocked off his bicycle had been carrying medical supplies in a crate attached to his bicycle. After the man fell from his bicycle, Ms. Davis reached over to try to help him of the ground.

**ANSWER: Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 140's allegations and therefore denies the same.**

141. As Ms. Davis was trying to help the man up from the ground,

Defendant Rossomanno approached Ms. Davis from behind, called Ms. Davis by her name and yelled at her to leave the area. The fact that Defendant Rossomanno knew Ms. Davis by name and yelled her named stood out to Ms. Davis.

**ANSWER:   Defendant admits that Defendant Rossomanno gave many commands to disorderly and riotous persons to disperse from the area of Waterman and Lake during and after an attack on the Mayor's house, but otherwise denies the allegations and conclusions of paragraph 141.**

142. At the time, Defendant Rossomanno was approximately five feet behind Ms. Davis. Instantly and without warning, Defendant Rossomanno sprayed Ms. Davis's posterior. Ms. Davis estimates the spray came from 12 to 18 inches away.

**ANSWER:   Defendant denies the allegations and conclusions of paragraph 142.**

143. Defendant Rossomanno then yelled that Ms. Davis had two seconds to get out of the area.

**ANSWER:   Defendant denies the allegations and conclusions of paragraph 143.**

144. Without verbal warning or other notice, Defendant Rossomanno continued toward Ms. Davis, reached his arm around the front of Ms. Davis and sprayed her a second time in the face and hair.

**ANSWER:   Defendant denies the allegations and conclusions of paragraph 144.**

145. The spray made caused Ms. Davis pain and made it difficult for her to see.

**ANSWER:**   **Defendant denies the allegations and conclusions of paragraph 145.**

146. Ms. Davis discontinued assistance to the man who had been knocked from his bicycle, and she was led away to safety by her friend.

**ANSWER:**   **Defendant denies the allegations and conclusions of paragraph 146.**

147. Defendant Rossomanno made no attempt to arrest Ms. Davis.

**ANSWER:**   **Defendant denies the allegations and conclusions of paragraph 147.**

148. Before getting sprayed, Ms. Davis did not hear any orders to disperse.

**ANSWER:**   **Defendant denies the allegations and conclusions of paragraph 148.**

149. Ms. Davis was not breaking any laws at the time, and nothing about the situation would lead any unbiased observer to believe that Defendant Rossomanno was in any danger at the time he sprayed Ms. Davis.

**ANSWER:**   **Defendant denies the allegations and conclusions of the paragraph.**

150. On September 17, 2017, Ms. Davis and her friend arrived at a march that was underway in downtown St. Louis. When the march ended near the

police headquarters, Ms. Davis gathered to talk to acquaintances.

**ANSWER:   Defendant is without sufficient knowledge and information to admit the allegations of the paragraph.**

151. Ms. Davis left the area near the police headquarters by bicycle to use the portable restrooms set up near the library. After using the restroom, Ms. Davis rode to her car parked on Chestnut before riding her bicycle to find the protesters again.

**ANSWER:   Defendant is without sufficient knowledge and information to admit the allegations of the paragraph.**

152. Ms. Davis caught up to the marching protesters and began walking her bicycle near the rear of the march alongside Darryck Dean from the U.S. Department of Justice's Community Relations Services.

**ANSWER:   Defendant is without sufficient knowledge and information to admit the allegations of the paragraph.**

153. Ms. Davis and Darryck Dean came upon broken flowerpots but did not see or hear the pots being broken.

**ANSWER:   Defendant admits that protesters damaged property, including flower pots, in downtown St. Louis during the evening of September 17, 2017; defendant otherwise is without sufficient knowledge and information to admit paragraph 153.**

154. Ms. Davis did not engage in any violence or destruction of property.

**ANSWER:   Defendant denies the allegations and conclusions of the paragraph.**

155. Ms. Davis observed an individual running from the front of the march back toward

156. Ms. Davis and yell that tear gas had been deployed at the front of the march.

157. Ms. Davis and others near the back of the march looked for an exit.

**ANSWER:   Defendant is without sufficient knowledge and information to admit paragraphs 155, 156 and 157 and accordingly denies same.**

158. Ms. Davis left earlier in the evening.

**ANSWER:   Defendant is without sufficient knowledge and information to admit paragraph 158.**

159. It was now after 9:00 PM, and the activity downtown had virtually ceased.

**ANSWER:   Defendant denies the allegations and conclusions of the paragraph.**

160. As Ms. Davis and her friend were returning to Ms. Davis's car, they came across a police line blocking Locust east of Tucker Boulevard.

**ANSWER:   Defendant is without sufficient knowledge and information to admit paragraph 160.**

161. The police officers issued a dispersal order to the ten or fewer

51

civilians in the area and directed them to head either north or west.

**ANSWER:  Defendant admits that repeated dispersal orders were given downtown during the evening and later hours of September 17, 2017; defendant otherwise denies the allegations of the paragraph.**

162. Ms. Davis and others turned to exit west on Locust toward Tucker but were met by a line of police vehicles blocking Tucker south of the intersection.

**ANSWER:  Defendant is without sufficient knowledge and information to admit paragraph 162.**

163. Upon meeting the line of police vehicles, Ms. Davis and others turned north on Tucker.

**ANSWER:  Defendant is without sufficient knowledge and information to admit paragraph 163.**

164. As Ms. Davis was stopped talking with friends, she heard "banging noises" and saw a line of SLMPD officers advancing from the north.

**ANSWER:  Defendant is without sufficient knowledge and information to admit paragraph 164.**

165. The sound that she heard was SLMPD officers pounding their batons in unison.

**ANSWER:  Defendant is without sufficient knowledge and information to admit paragraph 165.**

166. Ms. Davis turned away from the advancing officers and noticed another group of SLMPD officers advancing from the south.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 166.**

167. After noticing SLMPD officers closing in from the north and south, Ms. Davis and others attempted to leave the area by going west on Washington.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 167.**

168. Ms. Davis heard no dispersal order or commands.

**ANSWER:  Defendant denies the allegations and conclusions of the paragraph.**

169. As Ms. Davis and others were attempting to leave west on Washington, Ms. Davis encountered another set of SLMPD officers blocking the exit.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 169.**

170. As Ms. Davis turned back east on Washington to Tucker, she encountered a fourth line of SLMPD officers on bicycles blocking the egress east on Washington.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 170.**

171. The fourth line of SLMPD officers began shouting that everyone was being arrested.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 171.**

53

172. Ms. Davis and her friend sat next to their bicycles.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 172.**

173. The SLMPD officers began yelling at the civilians to "get down".

**ANSWER: Defendant admits that officers gave commands to arrestees as alleged.**

174. As Ms. Davis sent a phone message to friends that she was being arrested, an SLMPD officer approached Ms. Davis, took her phone, and threw the phone to the ground.

**ANSWER:  Defendant denies the allegations and conclusions of the paragraph.**

175. A second SLMPD officer approached Ms. Davis and ripped the goggles off Ms. Davis's face and pointed a spray can in her face while yelling unintelligibly. Ms. Davis could not hear the SLMPD officer because the officer's full gas mask covered his face.

**ANSWER:  Defendant denies the allegations and conclusions of the paragraph.**

176. Ms. Davis tried to explain to the SLMPD officer that she could not understand his commands. Instead of listening, the SLMPD officer continued pointing the spray can at Ms. Davis's face.

**ANSWER:  Defendant denies the allegations and conclusions of the paragraph.**

177. Ms. Davis observed other civilians turning over to face the ground with their arms spread.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 177.**

178. Ms. Davis inferred this was what the officer was telling at her to do, and she complied.

**ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 178.**

179. An unidentified officer grabbed Ms. Davis's hands roughly and tightly zip tied them behind her back.

**ANSWER:  Defendant admits that Plaintiff was handcuffed to "zip-tied" in a reasonable manner as with any arrestee; otherwise denied.**

180. Ms. Davis observed her friend sitting quietly and compliantly several feet away and being sprayed repeatedly in the face by an officer.

**ANSWER:  Defendant denies the allegations and conclusions of the paragraph.**

181. Ms. Davis saw liquid running down his face and soaking into his white shirt, turning it orange.

**ANSWER:  Defendant denies the allegations and conclusions of the paragraph.**

182. A different unidentified grabbed Ms. Davis up off the ground and propped her against a wall placed in a seated position with her feet out in front of

her.

ANSWER: Defendant is without sufficient knowledge and information to admit paragraph 182.

183. Ms. Davis was seated next to her friend, who was unable to see and was bleeding from a swollen and cut lip.

ANSWER:  Defendant denies the allegations and conclusions of the paragraph.

184. Ms. Davis observed her friend repeatedly ask for and be denied water and medical attention.

ANSWER:  Defendant denies the allegations and conclusions of the paragraph.

185. Ms. Davis overheard officers joke that her friend was covered so in pepper spray that they did not want to be the one that had to handle him.

ANSWER:  Defendant denies the allegations and conclusions of the paragraph.

186. Ms. Davis and others were then taken to vans to be photographed, identified, and documented.

ANSWER:  Defendant admits the allegations of the paragraph.

187. Ms. Davis's arrest slip listed Defendant Rossomanno as the arresting officer.

ANSWER:  Defendant denies the allegations and conclusions of the paragraph.

### COUNT I

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count I If the allegations of Count I, including ¶¶ 188-198, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 188-198.

### COUNT II

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count II If the allegations of Count II, including ¶¶ 188-198, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 199-209.

### COUNT III

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count III. If the allegations of Count III, including ¶¶ 210-220, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 210-220.

### COUNT IV

221. Plaintiff incorporate by reference the allegations in the foregoing paragraphs of  this Complaint as if fully set forth herein.

**ANSWER:**   Defendant incorporates the answers to the incorporated allegations.

222. Defendant City is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the other Defendants' violation of Plaintiff' rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices,  or customs that caused constitutional harm to Plaintiff are the following:

a. SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b. SLMPD's custom or practice of refusing to provide medical care to citizens  who are arrested, namely, refusing to treat those suffering from pepper spray and refusing  to loosen or release dangerously tight zip cuffs and treat resulting injuries;

c. SLMPD policy or custom of using kettling without warning on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

d. SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

e. SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

f. SLMPD's policy, custom, or practice of violating the Fourth

Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

**ANSWER:   Paragraph 222 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

223. Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, with respect to its officers' use of kettling and use of force.

**ANSWER:      Paragraph 223 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

224. Defendant City had notice that its use of force training and officer supervision was inadequate and likely to result in constitutional violations based on multiple incidents of excessive force against protestors in October 2014, November 2014, July 2015, August 2015, and September 2017.

**ANSWER:      Paragraph 224 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

225. Even after Defendant City agreed to adopt a new policy on the use of chemical weapons in the March 2015 *Templeton* settlement, Defendant City failed to properly implement the policy, did not initiate or require sufficient retraining of its officers on this supposed policy, and allowed the officers to operate

59

as they had before, as evidenced by the repeated constitutional violations perpetrated by SLMPD officers after that settlement and before the incident at issue in this case.

**ANSWER:** Paragraph 225 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.

226. Additionally, but without waiver of the foregoing, City officials failed to supervise, control, and/or discipline officers of the Department when they engaged in constitutional violations like those set forth above.

**ANSWER:** Paragraph 226 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.

227. SLMPD continues to rely on an Internal Affairs department that had been ineffective at curbing these unconstitutional behaviors, rather than adopt a process for the independent investigation and review of citizen complaints, evidences a continuing policy, custom or practice of inadequately supervising and disciplining officers for excessive force.

**ANSWER:** Paragraph 227 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.

228. SLMPD failed to implement any new policies or practices to identify or discipline  officers for the use of excessive force against individual citizens,

particularly in a police brutality   protest context, even after demonstrated unconstitutional behavior by SLMPD officers. SLMPD   continues to employ, promote and even give additional responsibility to SLMPD officers with a  known history of abusive behavior towards protestors.

**ANSWER:   Paragraph 228 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

229. SLMPD's policy, practice or custom of protecting its officers from the consequences of their unconstitutional behavior—such as clothing officers in riot gear including  face masks that hide the officers' identities, allowing officers not to wear name tags or other forms  of public identification, failing to document the names and badge numbers of all officers involved  in the arrests of protesters, and failing to document the use of force against protestors in any way— evidences the City's deliberate indifference, and complete failure to adequately supervise or  discipline its officers to assure compliance with state and federal laws or the Constitution of the United States.

**ANSWER:   Paragraph 229 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

230. Defendant City has ratified the unsafe and unconstitutional treatment of those arrested by SLMPD officers, particularly in protests, by its failure to adequately investigate complaints and failure to discipline or hold misbehaving

officers accountable and remove those officers from direct contact with civilians.

**ANSWER:** Paragraph 230 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.

231. In these failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff, as alleged herein.

**ANSWER:** Paragraph 231 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.

232. As a direct result of the conduct of Defendant City described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff' own safety, fear, apprehension, depression, anxiety, consternation and emotional distress, lost time, loss of employment opportunity, and loss of faith in society.

**ANSWER:** Defendant denies paragraph 232's allegations.

233. If Plaintiff prevail, Plaintiff are entitled to recover attorneys' fees, pursuant to 42  U.S.C. § 1988.

**ANSWER:** Defendant denies paragraph 233's allegations.

### COUNT V

*On January 19, 2021, individual Defendants filed a Motion to Dismiss*

Count V. If the allegations of Count V, including ¶¶ 234-247, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 234-247.

## COUNT VI

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count VI. If the allegations of Count VI, including ¶¶ 248-252, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 248-252.

## COUNT VII

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count VII. If the allegations of Count VII, including ¶¶ 253-257, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 253-257.

## COUNT VIII

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count VIII. If the allegations of Count VIII, including ¶¶ 258-265, are ever construed to state a claim against Defendant City, or if the allegations are

included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 258-265.

## COUNT IX

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count IX. If the allegations of Count IX, including ¶¶266-276, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 266-276.

## COUNT X

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count X If the allegations of Count I, including ¶¶ 277-286, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 277-286.

## COUNT XI

On January 19, 2021, individual Defendants filed a Motion to Dismiss Count XI. If the allegations of Count XI, including ¶¶ 287-291, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 287-291.

## COUNT XII

On January 19, 2021, individual Defendants filed a Motion to Dismiss

*Count XII. If the allegations of Count XII, including ¶¶ 292-302, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 292-302.*

## COUNT XIII

*On January 19, 2021, individual Defendants filed a Motion to Dismiss Count XIII If the allegations of Count XIII, including ¶¶ 303-312, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 303-312.*

## COUNT XIV

*On January 19, 2021, individual Defendants filed a Motion to Dismiss Count I If the allegations of Count I, including ¶¶ 313-323, are ever construed to state a claim against Defendant City, or if the allegations are included in any Count alleged against Defendant City, Defendant City denies the allegations in paragraphs ¶¶ 313-323.*

## OTHER ANSWERS

1.  Defendant denies all allegations of fact contained in the un-numbered "introduction" paragraph to Plaintiff's First Amended Complaint.

2.  Defendants request a jury trial on all issues so triable.

## AFFIRMATIVE DEFENSES

1.      Further answering, Defendants and each of them state that Plaintiff's second amended complaint fails to state a claim upon which relief can be granted in each and every count

2..      Further answering, Defendant states that all actions of the individual Defendant officers with regard to Plaintiff were taken on the basis of probable cause or arguable probable cause to believe that Plaintiff was violating ordinances or statutes, that Defendants reasonably believed that said defendants' actions were lawful, that no act of Defendants violated any clearly established constitutional right of Plaintiff, and so the individual Defendant is immune from liability by reason of the doctrine of qualified immunity. Because the individual Defendants herein committed no constitutional tort, Defendant City of St. Louis is not liable to Plaintiff on any theory.

3.      Further answering, Defendant states that Plaintiff failed to mitigate his damages by failing to disperse as requested by officers of the law and by failing promptly to seek medical attention or treatment for claimed injuries.

4.      Further answering, Defendant states that all state law claims asserted against any defendant in an individual or official capacity are barred by sovereign immunity or by official immunity in that the individual defendants herein, in taking any actions with regard to Plaintiff were exercising discretion in the performance of official duties in preserving public order and arresting persons reasonably believed to be violating valid ordinances or statutes.

5.     Further answering, Defendant states that all state law claims asserted against any defendant in an individual or official capacity are barred because, at the time of each Plaintiff's alleged injury, each individual defendant was performing a public duty in responding to an unlawful assembly and other unlawful acts of numerous persons so as to preserve public order and the rights of the public in general.

6.     Further answering, Defendant states that liability, if any, to Plaintiff cannot be joint and several, and damages, if any, can be awarded against any defendant solely based on that individual defendant's conduct directly causing such damages.

7.     Further answering, Defendant states that any use of force by the individual defendants herein against Plaintiff was privileged because the force was used reasonably applied (a) in order to overcome unlawful resistance to or interference with an arrest, which Plaintiff knew was occurring, (b) in self-defense by the individual defendants, against whom Plaintiff used or threatened to use force to prevent defendants from arresting another person or persons, (c) in defense of third persons, namely other officers at the scene of Plaintiff's arrest, against whom Plaintiff was using or threatening the use of force, or (d) as otherwise authorized by Missouri law, including but not limited to §563.021 and §563.046, RSMo.

8.     Further answering, Defendant states that the injuries suffered by Plaintiff, if any, were of such a nature as can be remedied by existing remedies under the law of Missouri, which state law remedies are sufficient post-deprivation remedies so that

Plaintiff was not and is not deprived of any liberty or property interest without due process of law as prescribed by the Fourteenth Amendment by reason of the acts or conduct of Defendants.

9.      Further answering, Defendant states that, with respect any negligence count asserted by Plaintiff, if Plaintiff suffered any injury by reason of any negligent action of Defendants--which Defendant denies--then and in that event fault must be apportioned to Plaintiff by reason of Plaintiff' negligence or assumption of risk in that Plaintiff chose to encounter the known risk of injury to himself arising from the alleged breach of duty by defendants.

10.     Further answering, the state law claims against Defendant City of St. Louis are barred by sovereign immunity.

11.     Defendant incorporates each and every additional affirmative defense that may be uncovered or made known during the investigation and discovery of this case. Defendant specifically reserves the right to amend this Answer to include additional affirmative defenses at a later time.

WHEREFORE, having fully answered, Defendant respectfully requests that this Court dismiss this case, with prejudice, and for any other such relief as this Court deems proper.

 Respectfully submitted,
MICHAEL A. GARVIN
CITY COUNSELOR

Respectfully submitted,

MICHAEL A. GARVIN

CITY COUNSELOR
/s/Robert H. Dierker 23671(MO)
Deputy City Counselor
dierkerr@stlouis-mo.gov
Brandon Laird, 65564 (MO)
lairdb@stlouis-mo.gov
Abby Duncan 67766(MO)
Associate City Counselors
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956
*Attorneys for Defendants*